# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

JOSEPH EDWARD FITE,
Plaintiff,

Case No. 1:17-cv-57
Barrett, J.
Litkovitz, M.J.

vs.

COMMISSIONER OF
SOCIAL SECURITY,
Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Joseph Edward Fite brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). This matter is before the Court on plaintiff's Statement of Errors (Doc. 14), the Commissioner's response in opposition (Doc. 17), and plaintiff's reply (Doc. 18).

## I. Procedural Background

Plaintiff previously filed applications for DIB and SSI in 2009. Following a hearing before ALJ Larry Temin, plaintiff was granted a closed period of disability from April 2009 to October 31, 2009. (Tr. 81-94). Plaintiff returned to work and worked as a janitor through May 2013, when he allegedly was laid off because of the frequency of his seizures. (Tr. 25). He received unemployment benefits for a period of time. He then attempted work as a dishwasher in December 2013 for one day and had a seizure on the job. (Tr. 44-45, 1168). Plaintiff has not worked since then. (Tr. 44).

In the meantime, plaintiff filed applications for DIB and SSI in July 2013, alleging disability since July 17, 2013, due to a seizure disorder, traumatic brain injury, and left eye

blindness. (Tr. 114). Plaintiff's applications were denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing before ALJ Jana Kinkade. Plaintiff and a vocational expert (VE) appeared and testified at the ALJ hearing. On September 24, 2015, the ALJ issued a decision denying plaintiff's DIB and SSI applications. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

2

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

**B. The Administrative Law Judge's Findings**

ALJ Kinkade applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff met] the insured status requirements of the Social Security Act through December 31, 2017.

2. The [plaintiff] has not engaged in substantial gainful activity since July 17, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The [plaintiff] has the following severe impairments: epilepsy, status post left-eye repair, and adjustment disorder with mixed features, status post 2006 traumatic brain injury (20 CFR 404.1520(c) and 416.920(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following limitations: he can lift and/or carry 20 pounds occasionally and 10 pounds frequently. He can frequently stoop, kneel, crouch, and crawl. He can occasionally climb ramps and stairs. He

3

can never climb ladders, ropes, or scaffolds. He can never operate automotive equipment, work at unprotected heights, around hazardous machinery, or work around an open fire. He can have no exposure to temperature extremes. He cannot perform work requiring depth perception (i.e., three dimensional vision). Mentally, the claimant is able to perform routine, repetitive tasks with no more than superficial interaction with the general public, coworkers, and supervisors and no strict production quotas or more than ordinary and routine changes in work setting or duties.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[1]

7. The [plaintiff] was born [in] . . . 1987 and was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because the [plaintiff's] past relevant work is unskilled (20 CFR 404.1568 and 414.968).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from January 1, 2011, through the date of [the ALJ's] decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 21-32).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

---

[1] Plaintiff's past relevant work was as a janitor, which was performed at the light level of exertion. (Tr. 31).
[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light jobs such as housekeeping cleaner (150,000 jobs nationally), cafeteria attendant (60,000 jobs nationally), and router (55,000 jobs nationally). (Tr. 32).

4

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Medical evidence relating to seizures

Plaintiff sustained a traumatic brain injury and traumatic eye injury with lens extraction on the left as the result of a serious automobile accident in 2006. (Tr. 26, 641, 1069). Following the accident, plaintiff experienced ongoing seizure activity. (*Id.*).

As it relates to the relevant time period, the record shows that on July 5, 2012, plaintiff experienced an aura at work, which is a precipitating sign of seizure activity. A co-worker

5

started to drive plaintiff home, when plaintiff had a seizure in the car. The co-worker drove plaintiff to the emergency department where the seizure was witnessed by the emergency department staff. (Tr. 406). Plaintiff stated he had been taking his medication as prescribed. (*Id.*).

Plaintiff had another seizure at work on July 23, 2012 and was taken to the hospital. (Tr. 388). Emergency department records state, "PT brought in by squad after seizing at work. Became combative in the squad. Witness states the PT was acting quiet today at work and fell to the floor started seizure around 1400 hrs. Witness states seizure lasted five minutes. Vomiting during seizure, tightened up, was lying on right side while seizing. Witness states patient hit his head while falling to the ground and started seizing." (*Id.*). The record notes that plaintiff's family reported he had missed a few days of medication. (*Id.*). Neurologically, plaintiff was positive for seizures and loss of consciousness. (Tr. 389).

On January 2, 2013, plaintiff was taken to the emergency department for another seizure at work. (Tr. 374). His boss found him in the bathroom, "walking around but 'incoherent.'" (*Id.*). Plaintiff hit his face/head on a toilet and sustained a superficial abrasion to the right cheek. (Tr. 374, 376). Plaintiff reported a lot of nausea, confusion, and headache. (Tr. 374). Plaintiff advised he had been taking Keppra and Depakote as prescribed. (*Id.*).

On May 2, 2013, plaintiff experienced a grand mal seizure at work and was taken to the hospital, where his seizures continued in the emergency department. (Tr. 361). The emergency department records note that plaintiff's seizure "[c]haracteristics include[d] eye blinking, eye deviation, rhythmic jerking and loss of consciousness." (*Id.*). Plaintiff's seizure in the emergency department lasted 9 minutes, followed by a post ictal period and concern for aspiration during the seizure. (Tr. 421). Plaintiff's family reported he experiences seizures

6

approximately every other month and that plaintiff takes his medication as prescribed. (Tr. 361). Plaintiff was admitted to the ICU for further monitoring and treatment. (Tr. 418). A neurology consultation on May 3, 2013 with treating neurologist James Anthony, M.D., stated that plaintiff had been followed off and on for several years for epilepsy, and he had not been to the office in more than three or four years. (Tr. 425). Dr. Anthony reported that plaintiff had been treated with Depakote and Keppra in pill form in the past "and apparently has done pretty well with that when he was able to obtain medicine as he apparently has had difficulty maintaining jobs and maintaining insurance coverage." (*Id.*). Dr. Anthony reported this had been on ongoing problem for a long time. Dr. Anthony noted that plaintiff had been admitted to the ICU with a history of seizures, and he was currently receiving Keppra and Depakote in an intravenous form. (*Id.*). Dr. Anthony reported that plaintiff had "a pretty good Depakote level at the ER of 64. This will need to be watched, and hopefully the patient will see improvement." (*Id.*). Plaintiff was discharged from the hospital on May 3, 2013 with diagnoses of seizure disorder and aspiration into the respiratory tract. (*Id.*).

On July 26, 2013, plaintiff had a seizure at home. (Tr. 435). He was taken to the emergency department where he reported that at his home "he felt like he was going to have a seizure and called his father." (*Id.*). Plaintiff's father reported that he observed plaintiff having "a generalized tonic colonic seizure lasting one to two minutes." (*Id.*). He also reported that plaintiff "is good about taking medications." (*Id.*). Plaintiff complained of pain throughout his entire body, including headache, and stated this is typical following a seizure. Plaintiff also reported that his seizures are triggered by stress and lack of sleep. (*Id.*).

On December 27, 2013, plaintiff experienced a seizure at work and was taken to the emergency department. (Tr. 1168). The seizure was characterized as "a 2 minute long

generalized tonoclonic seizure." (*Id.*). Plaintiff stated he was taking "anti-epileptics Keppra and Depakote, but has been taking them less than normal but to cost concerns." (Tr. 1168). His Depakote level was below normal. (Tr. 1172, 1173). Upon arrival at the emergency department, plaintiff was vomiting, disoriented, not speaking, and not answering questions. (Tr. 1174).

Plaintiff was admitted to the hospital on February 11, 2014 following persistent seizure activity at home and at the emergency department. (Tr. 984). He had not been compliant with his medications. (*Id.*). He was diagnosed with seizure disorder, aspiration into the respiratory tract, for which he was intubated, and acute renal failure. (Tr. 984, 988, 989). Dr. Anthony, his neurologist, reported that plaintiff "had not been taking his medicines adequately to prevent seizures and wound up with this episode of multiple activity associated with epilepsy." (Tr. 993). A critical care note states that plaintiff had "recently been tapering his seizure medication because he believes he no longer needs to take them." (Tr. 994). Plaintiff remained in the hospital for three days. He was discharged on February 14, 2014. His discharge home medications were Depakote 500 mg DR tablets four times per day for 90 days and Depakote 500 mg EC tablets for 5 days. (Tr. 983).

On March 30, 2014, plaintiff experienced two seizures at home. Once the EMS arrived, plaintiff had a third seizure. (Tr. 1055). Plaintiff's mother reported that plaintiff took Depakote, 500 mg. four times per day. (*Id.*, 1069). His Valproic level was 103.0. Plaintiff stated his last seizure was several weeks ago. (Tr. 1059). He was admitted to the hospital and discharged the following day. His Keppra, which had been recently discontinued, was restarted. (Tr. 1067-68, 1070).

Plaintiff was seen by Dr. Anthony on April 8, 2014. (Tr. 960). Dr. Anthony reported that plaintiff "is apparently well and free of seizures" and that his seizures have decreased over

8

time. Dr. Anthony stated that plaintiff's symptoms, which included seizures and headaches, have affected his levels of consciousness. Dr. Anthony wrote, "They happen infrequently and are considered severe." (Tr. 960). Plaintiff's Valproic level was within normal limits. (Tr. 959, 1166).

Plaintiff had a seizure that was witnessed by EMS personnel on June 7, 2014. (Tr. 1149). Plaintiff reported that he "hurts all over" and "is compliant with his meds." (*Id.*). His Valproic level was abnormally high. (Tr. 1152).

On November 4, 2014, plaintiff presented to the emergency department after experiencing seizures. (Tr. 1131). Plaintiff called the EMS after having a seizure at home and when the EMS arrived they noted he had three additional seizures lasting approximately 10 seconds each that were tonic-clonic in nature. (*Id.*). Plaintiff reported a headache that was similar to those he typically experienced after a seizure and was observed to be sleepy and able to answer simple questions. (*Id.*). His Valproic acid level was normal, and "[h]is Depakote appears to be therapeutic and Keppra has been taken as prescribed per the patient." (Tr. 1135). Plaintiff was advised to call his neurologist and "make them aware of his seizure activity today as well as recurrent seizures that did not seem to be well controlled on his medications. . . ." (Tr. 1136).

On December 22, 2014, plaintiff had two seizures en route to the hospital in the life squad and one upon arrival at the emergency department. (Tr. 1116). Plaintiff denied missing any seizure medications and reported he takes Keppra and Depakote. He also reported his neurologist retired and he had not seen a neurologist in many months. (*Id.*). His Valproic acid level was within normal limits. (Tr. 1119). The emergency room physician recommended

9

increasing plaintiff's dosage of Keppra and that plaintiff see a neurologist for a consultation. (Tr. 1120).

On January 28, 2015, plaintiff was examined by neurologist Maureen Li, M.D. (Tr. 967). Dr. Li reported that plaintiff had last been seen by Dr. Anthony in their office on April 8, 2014 and "[t]here have been some complications since [his] last visit." (Tr. 967). Dr. Li reported:

> The patient had a severe head trauma and was in intensive care for several weeks and then went to Drake Hospital at age 19. The seizures started about a year later which was probably 2007. He was seen by Dr. Anthony. His last EEG in December of 2014 showed mild generalized slowing. The patient holds a job periodically. He was laid off due to a seizure. He has a grand mal seizure about once every 2 months. He has an aura of feeling good followed [by a] metallic taste about once to three times a week. He had applied for social security disability, there was a social security disability review on the chart. He is currently living with his father. After the last seizure the Keppra dose was increased to 500 TID and he is on Depakote 500 TID [three times a day] also.

(Tr. 967). Plaintiff's Keppra level was within normal limits. (Tr. 970).

Plaintiff experienced four witnessed seizures on July 26, 2015 and was taken to the emergency department by the EMS. (Tr. 1085). Plaintiff reported he was being followed by Dr. Li for management of his seizures and he was taking Depakote. Plaintiff stated he has been taking his medication as prescribed and denied any recent changes to his medication. (*Id.*). He was actively seizing upon arrival to the emergency department, given 1 mg. of Ativan, and stopped seizing. However, he began to seize again shortly and did not return to baseline between seizures. Plaintiff stated his last seizure was several months ago. (Tr. 1086). His Valproic acid level was below normal. (Tr. 1089). The emergency room doctor advised plaintiff to follow up with his neurologist "to discuss his Depakote dose given that his level was low despite the patient stating that he is compliant." (Tr. 1091).

**D. Specific Errors**

10

On appeal, plaintiff alleges (1) the ALJ erred by failing to mention or consider lay evidence of record from plaintiff's employer; (2) the ALJ's credibility determination failed to comply with Social Security regulations; and (3) the ALJ's finding that plaintiff can perform sustained work activity is not supported by substantial evidence.

**1. Lay evidence from plaintiff's former employer**

Plaintiff alleges the ALJ erred by not mentioning or considering a statement from plaintiff's former employer which is relevant to whether plaintiff can sustain full-time employment with his seizure disorder. Lori Salchli, plaintiff's supervisor from 2012 and 2013 at Engineered Mobile Solutions, Inc., provided a statement dated January 2, 2014. Ms. Salchli's statement sets forth the accommodations the employer made for plaintiff while he worked for the company:

> Joe was not allowed to operate a tow motor. We assigned other employees to drive the trash dumpster outside and pick it up to dump into the big dumpster for him.
>
> Joe worked at MSI before his accident. All of the owners and management came from MSI. We hired Joe because we knew him well and wanted to help him.
>
> At times, I would create work to keep Joe busy. Other times, we would assign him to another employee as their helper.
>
> Due to Joe's epileptic seizures, I did not follow the same attendance rules with Joes compared to other employees.
>
> Joe was our janitor so there was not a production quota involved. If there were, however, his requirements would be much lower.
>
> If it was very hot in the shop, we would have Joe stop early and rest or I would ask someone to drive him home.
>
> We became familiar with Joe's symptoms before an attack. Other employees watched out for him and would bring him into the office to sit and rest. This happened quite a few times while Joe was still on the clock.

(Tr. 320-21).

11

The Commissioner contends that while the ALJ did not explicitly discuss Ms. Salchli's statement, it is clear from the ALJ's decision that she considered it and incorporated many of the accommodations into the RFC. (Doc. 17 at 6, citing Tr. 24).

In addition to information from medical sources, an ALJ is required to consider descriptions and observations of a claimant's limitations from impairments and symptoms by "family, neighbors, friends, or other persons." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). This Court has previously held that an ALJ's failure to address lay evidence concerning a claimant's symptoms is reversible error. *See Van Buskirk v. Astrue*, No. 2:09-cv-867, 2010 WL 3365929, at *2-3 (S.D. Ohio Aug. 23, 2010). In that case, the Court ordered a remand for further consideration of lay evidence concerning the frequency and severity of the plaintiff's seizures, including their propensity to cause loss of consciousness or significant interference with activity. The Court noted:

> "[L]ay testimony as to a claimant's symptoms is competent evidence which the Secretary must take into account, *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993), unless he expressly determines to disregard such testimony, in which case 'he must give reasons that are germane to each witness.'" *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). An ALJ's failure to expressly set forth reasons discounting lay witness testimony is erroneous. *Id.*

*Van Buskirk*, 2010 WL 3365929, at *2 (quoting *Witte v. Astrue*, No. 1:08-cv-447, 2009 WL 2983057 at *10 (S.D. Ohio 2009) and citing *Stout v. Comm'r Soc. Sec.*, 454 F.3d 1050, 1056 (9th Cir. 2006) (ALJ's "silent disregard of lay testimony" is grounds for reversal); *Smith v. Heckler*, 735 F.2d 312, 313 (8th Cir. 1984) (disregard of lay evidence violates regulations; ALJ must discuss testimony specifically and make explicit credibility determinations)).

The ALJ's failure to consider and weigh the lay statement of plaintiff's former employer is reversible error. Contrary to the Commissioner's argument, it is not evident that the ALJ considered the former employer's statement and incorporated the restrictions identified into

12

plaintiff's RFC. First, those restrictions could well have been based on plaintiff's testimony at the hearing. (Tr. 51, 56: no driver's license; seizures precipitated by stress and overheating). More importantly, the RFC does not incorporate all of the accommodations made by the former employer so plaintiff could sustain employment as a janitor. While the ALJ included restrictions on operating automotive equipment, exposure to temperature extremes, and production quotas in the RFC, she did not include the other accommodations that plaintiff's former employer made for plaintiff's seizure disorder: relaxed attendance rules in comparison to other employees, allowing plaintiff to sit and rest before an "attack," and assigning "busy" work to keep plaintiff occupied during the work day. The former employer's statement bears directly on plaintiff's credibility as to the frequency of his seizures and the effect on his ability to sustain full-time work activity. The emergency department records outlined above document the frequency of seizure activity causing plaintiff to seek emergency treatment. However, plaintiff testified and the medical records reflect that plaintiff experienced additional seizures that did not result in hospital visits but that nonetheless impact his ability to sustain work activity. The former employer's statement supports plaintiff's need for a flexible work schedule and additional accommodations, such that plaintiff may not be able to work on a regular and continual basis given the frequency and sequelae of his seizures, including the recovery period from seizures. The Court cannot say that the ALJ's failure to explicitly consider the former employer's statement is harmless error. Therefore, plaintiff's first assignment of error should be sustained.

**2. The ALJ's credibility finding.**

It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citations omitted). In light of the Commissioner's opportunity to observe the

individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001). *See also Walters v. Comm'r. of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997) ("[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."). Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Id.*

The ALJ cited several reasons for finding plaintiff's subjective allegations and complaints were not fully credible to the extent they would preclude a restricted range of light work: the objective evidence and plaintiff's daily activities are inconsistent with plaintiff's subjective allegations of limitations; issues of compliance called his credibility into question, as plaintiff is generally functioning well when consistent with treatment and medication; and he continues to smoke marijuana on a weekly basis. (Tr. 26-28).

Plaintiff alleges that the reasons cited by the ALJ to conclude that plaintiff's statements "concerning the intensity, persistence and limiting effects" of his symptoms are not entirely credible do not address the severity and frequency of plaintiff's seizures and how they affect his ability to work. Plaintiff alleges that his "primary work limitation is that stress and work cause additional seizures" and that the ALJ's discussion of plaintiff's credibility has no bearing on this critical issue. Plaintiff also alleges the ALJ improperly conflated the issue of compliance with treatment and plaintiff's credibility. Plaintiff contends the one instance concerning his "ill-conceived attempt to wean himself off medication" in February 2014 does not detract from the credibility of the limitations he alleges from his seizures, and any other alleged non-compliance was related to his inability to afford medication. (Doc. 14 at 6, citing Tr. 971, 639). In addition, plaintiff contends the evidence showing he continued to smoke marijuana does not suggest he is

14

not credible because he truthfully acknowledge his use and Dr. Anthony opined that plaintiff's occasional use of marijuana did not have any effect on his epilepsy. (*Id.*, citing Tr. 640).

The Commissioner contends the ALJ's credibility decision is supported by the objective record which reflects plaintiff's "repeated reports that his seizures were controlled by medication and that they had decreased over time." (Doc. 17 at 8, citing 356, 425, 972, 984). Conversely, evidence of non-compliance with medication detracted from plaintiff's allegations because plaintiff is "seizure free . . . when taking medication as prescribed." (*Id.* at 9, citing Tr. 22, 388, 646, 973). In terms of marijuana use, the Commissioner argues that the ALJ appropriately found that plaintiff's ability to spend money on discretionary items like marijuana detracted from his claim that he was at times unable to afford his seizure medication. (*Id.* at 9-10, citing Tr. 29).

The Court agrees with plaintiff that the critical question in terms of plaintiff's credibility is whether the allegations of the frequency and effects of plaintiff's seizures preclude work activity on a sustained basis. Whether plaintiff is able to perform activities of daily living when he is *not* experiencing seizures has little bearing on this critical issue. Similarly, whether plaintiff exhibits normal strength, motor tone, reflexes, sensation, and the like fails to shed light on whether his seizures and sequelae are of a frequency and severity to preclude sustained work activity.

The ALJ's reliance on plaintiff's non-compliance with his medications as a reason to discount his credibility is not supported by substantial evidence. The Commissioner cites to only two instances of non-compliance: plaintiff's "ill-conceived" attempt to wean himself off medications in February 2014 because he mistakenly believed he no longer needed them (Tr. 972, 973, 984) and one instance in July 2012, when emergency department records reflect that plaintiff missed a few days of his medications (Tr. 388). The Commissioner also cites to two

records from Dr. Anthony purporting to show plaintiff did well when compliant with his medications. In a progress note dated October 26, 2012, Dr. Anthony stated that plaintiff is "taking Keppra and Depakote and is free of seizures and his Depakote level is great." (Tr. 356). In a consultation note dated March 2, 2013, Dr. Anthony wrote that plaintiff "apparently has done pretty well . . . when he was able to obtain medicine as he apparently has had difficulty maintaining jobs and maintaining insurance coverage." (Tr. 425). The Commissioner's citations to these instances must be viewed in the context of the record as a whole. It is notable that the medical records reflect that plaintiff experienced seizures when he was both compliant and non-compliant with his medications. In contrast to the two records cited by the Commissioner showing plaintiff experienced seizures when he was non-compliant with his medications, there are numerous records showing plaintiff was treated in the emergency department or hospitalized for seizures despite taking his medication as prescribed. *See* Tr. 406 (July 5, 2012); Tr. 374 (January 2, 2013); Tr. 361 (May 2, 2013); Tr. 436 (July 26, 2013); Tr. 1055 (March 2014); Tr. 1149 (June 7, 2014); Tr. 1131 (November 4, 2014); Tr. 1116 (December 22, 2014); Tr. 1085 (July 26, 2015). In fact, one of Dr. Anthony's notes cited by the Commissioner to suggest plaintiff had done well when taking his medication is from plaintiff's hospitalization in May 2013, when Dr. Anthony noted that plaintiff's Depakote level in the emergency room was "pretty good," suggesting non-compliance was not a factor in this instance of seizure activity. (Tr. 425). In any event, plaintiff experienced another seizure and was hospitalized despite compliance with his medications just two months after Dr. Anthony wrote this note. (Tr. 435). Notably, neither the ALJ's decision nor the Commissioner's brief acknowledges or discusses the emergency department records from December 27, 2013 to July 26, 2015 (Tr. 1084-1186, Exhibit B17), which indicate plaintiff experienced seizure activity at a level requiring emergency treatment

despite apparent compliance with his medication. Dr. Anthony's reports indicating plaintiff was "doing well" and was seizure free (Tr. 26, 27) and two instances of non-compliance in July 2012 (Tr. 26) and February 2014 (Tr. 27) does not constitute substantial evidence the ALJ could rely on to discount plaintiff's allegations of limitations from seizure activity in view of the record as a whole.

The final reason the ALJ cited to discount plaintiff's credibility is his marijuana use. Plaintiff contends he was forthcoming about his marijuana use, which bolsters his credibility, and Dr. Anthony found no relation between occasional marijuana use and epilepsy. The Commissioner argues that the ALJ cited plaintiff's marijuana use in response to plaintiff's claims of inability to afford his medications at times, which resulted in seizures.

Emergency records suggest that sub-therapeutic levels of medication may have contributed to plaintiff's seizure on December 27, 2013, during the relevant time period. The records also reflect that plaintiff had been taking less of his prescribed medications due "to cost concerns." (Tr. 1168). A claimant's non-compliance with prescribed medication is not a valid factor in assessing credibility when the claimant is unable to afford the medication. *See Durham v. Comm'r of Soc. Sec.*, No. 1:07-cv-450, 2008 WL 3843296, at *7–8 (S.D. Ohio Aug. 14, 2008) (Barrett, J.; Black, M.J.). On the other hand, evidence of discretionary purchases by a claimant may undermine the credibility of his alleged inability to afford treatment. *See Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 542 (6th Cir. 2014) (citing *Sias v. Sec'y of H.S.S.*, 861 F.2d 475, 480 (6th Cir. 1988) (noting claimant's testimony that he could not afford $100.00 for support hose prescribed by his physician was contradicted by his admission that he smoked two packs of cigarettes a day)). In view of the medical evidence cited above that shows plaintiff continued to experience seizure activity despite taking his medication as prescribed, plaintiff's admitted

17

marijuana use and his alleged inability to afford medication in December 2013 does not constitute substantial evidence undermining plaintiff's credibility. Plaintiff's second assignment of error should be sustained.

### 3. Ability to perform sustained work activity

As his third assignment of error, plaintiff alleges the ALJ failed to include limitations in the RFC related to plaintiff's documented history of seizures at work and elsewhere, which indicate plaintiff is unable to sustain work activities in an ordinary work setting on a regular and continuing basis. (Doc. 14 at 8, citing SSR 96-8p[3]). This assignment of error appears to be an amalgamation of plaintiff's first and second assignments of error. As those assignments of error should be sustained, the ALJ on remand should also consider whether the frequency and sequelae of plaintiff's seizures preclude sustained work activity on a regular and continuing basis.

## III. Conclusion

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court notes that all essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of his alleged onset date. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). This matter should be reversed and remanded for further proceedings with instructions to the ALJ to consider the lay evidence of record in accordance with this decision; to reconsider plaintiff's credibility; to consider whether the frequency and sequelae of plaintiff's seizures

---

[3] "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p, 1996 WL 374184 (July 2, 1996).

18

preclude sustained work activity on a regular and continuing basis; and to further develop the medical and vocational evidence as warranted.

**IT IS THEREFORE RECOMMENDED THAT:**

The ALJ's decision be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

Date: 2/8/18

Karen L. Litkovitz
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JOSEPH EDWARD FITE,
Plaintiff,

Case No. 1:17-cv-57
Barrett, J.
Litkovitz, M.J.

vs.

COMMISSIONER OF
SOCIAL SECURITY,
Defendant.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).